IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                       **REPORT AND
RECOMMENDATION**

v.

                                       11-CR-00292-RJA-JJM

GRAHAM FLAGG GODBEY,

                        Defendant.

_____

        Defendant is charged in an Indictment [13][1] with transportation and possession of

child pornography, in violation of 18 U.S.C. §§2252A(a)(1) and §2252A(a)(5)(B). He moves to

suppress his statements made to Canadian authorities on June 29, 2010 and to United States

authorities on June 30, 2010.  Saraceno Affirmation [20], ¶¶16-30.[2]  That motion, being

dispositive, has been referred to me by Hon. Richard J. Arcara for a Report and Recommendation

[14].

        An evidentiary hearing was held before me on March 2, 2012 [43], at which the

government offered the testimony of Group Supervisor ("GS") Douglas M. Turton of the

Department of Homeland Security, Homeland Security Investigations ("HSI"), as well as HSI

Special Agents ("SAs") Joseph Stroh, and Matthew DellaPenta.  Thereafter, the parties filed

post-hearing submissions [45, 46]. For the following reasons, I recommend that defendant's

motion to suppress be denied.

---

[1]       Bracketed references are to CM/ECF docket entries.

[2]       Although defendant initially also moved to suppress the physical evidence seized
pursuant a search warrant issued by Hon. H. Kenneth Schroeder, Jr. on January 10, 2011 (Saraceno
Affirmation [20], ¶¶31-38), in his reply ([27]) defendant did not identify this as an issue remaining in
dispute.  I also previously denied defendant's motion for a bill or particulars and the parties agreed that
the government will provide Giglio material in accordance with the timetable established by the trial
judge. December 27, 2011 Text Order [29].

**BACKGROUND**

At approximately 12:30 a.m. on June 29, 2010, defendant was apprehended by Canadian authorities while entering Ontario, Canada at the Peace Bridge port of entry, and was charged with possession of child pornography which was discovered on his laptop computer. Defendant's Affidavit [30], ¶¶1-9. He spoke with "duty counsel" in Ontario, who told him that he had the right to retain a private attorney (id., ¶13). He claims that Canadian officials denied him the opportunity to contact his family to arrange for an attorney (id., ¶¶14-15).

He was then transported to Welland, Ontario, where he was interviewed by Detective Constable Tara Henderson of the Niagara Regional Police. The DVD of that interview [42-3] shows that defendant told her that he did not want to talk to her for fear of incriminating himself, and that he wished to consult with an attorney. Although she told him that he did not have to say anything, she thereafter continued to question him. It appears from the DVD that she attempted to gain his trust, for example by complimenting him on obtaining his GED diploma and stating that there is nothing wrong with viewing adult pornography. She told defendant that they would obtain a search warrant for the computer and asked him whether they would find child pornography on the computer. He said yes. She pressed him about how much they would find, and he said "not much".

On June 30, 2010 defendant was transported to St. Catherine's for his bail hearing. After posting bail, he was escorted back to the Peace Bridge, and drove back to the American side of the bridge ([30], ¶¶21, 24, 25).

SA DellaPenta testified that at approximately 2:15 p.m. on June 30, 2010, he was contacted by SA Stroh, who told him "that there was a child pornography or child exploitation

lead or incident at the Peace Bridge" and gave him the contact information for Detective

Constable Henderson ([43], p. 29).  Prior to speaking to SA Stroh, he had no information

concerning defendant's case (id., pp. 30-31). He then contacted Detective Constable Henderson,

who advised him that defendant "had been encountered on the Canadian side of the Peace Bridge

the previous day and that he had been found with suspected child pornography in his possession"

(id., p. 30). She also told him that defendant had been interviewed regarding the incident and

"either had or was in the process of making bail and would be released back to the United States

upon making bail" (id., pp. 31-32, 62).  He did not recall her telling him that defendant had

requested an attorney (id., p. 45).

At approximately 6:10 p.m. that day, SA DellaPenta met defendant at the Peace

Bridge (id., pp. 32-33) after defendant had been instructed by Customs and Border Protection to

submit to a secondary interview (id., pp. 55-56). He administered Miranda warnings, and

defendant executed a waiver of his Miranda rights at 6:14 p.m. (id., pp. 34-36, 39-40; [42-2]).

SA DellaPenta  interviewed defendant for between 75 and 90 minutes (id., pp. 33-34).

Defendant was provided with water on multiple occasions during the interview (id., p. 34).

At the conclusion of the interview (memorialized in  SA DellaPenta's Report of

Investigation [42-1]), defendant was released from the port of entry, and was not arrested ([43],

pp. 37, 63).

SA DellaPenta testified that "[o]ne of the primary purposes of us taking over the

investigation is the fact that upon a conviction, [defendant] would typically have to register as a

sex offender here in the U.S. If he was convicted in Canada, he would not" (id., p. 58).  The

decision as to which country will  prosecute  a United States citizens encountered by Canadian authorities with child pornography is handled on a case-by-case basis (id.).

GS Turton testified that his primary responsibility was drug investigations and that if he received a call concerning child pornography, he would have referred it to a group that specializes in this subject matter (id., pp. 11-12). While he had no specific independent recollection of receiving a call from the Niagara Regional Police on June 29, 2010, from a review of SA DellaPenta's notes, he believed that he contacted SA Stroh, the duty agent, to have him "get ahold of the right group" (id., pp. 12, 16).  He stated that it was common for Canadian authorities to contact United States authorities concerning crimes committed in Canada or on the border, and that the United States authorities would reciprocate (id., p. 14).  GS Turton's task force group, which contained Canadian law enforcement officials, worked with Canadian authorities every day (id., pp. 14-15).  However, this group did not handle any child pornography matters (id., p. 16).  GS Turton denied that he directed the Niagara Regional Police Services or anyone from the Canadian authorities with respect to this case (id., pp. 16-17).

SA Stroh was assigned to the border enforcement security task force that focused on the smuggling of narcotics and weapons (id., pp. 19-20, 23).   He similarly had no independent recollection of this case, but his review of SA DellaPenta's notes indicated that he had contacted SA DellaPenta (id., p. 22).

SA Stroh stated that he never handled a child pornography case or investigation (id., pp. 23, 26). It was typical for him to reach out to the appropriate group or agent if he received information concerning child pornography (id., p. 22). Since he had no recollection of this case, he was unable to testify with certainty that he did not instruct or direct anyone from the

Niagara Regional Police Services or anyone from the Canadian border authorities concerning this matter (id., pp. 25-26).  However, since he had "absolutely no experience and/or working knowledge of how to work a child pornography case", he testified that he "wouldn't even know where to begin to instruct another law enforcement official" (id., p. 26).

Prior to Detective Constable Henderson's interview of defendant in Welland, Detective Constable Sean Turkot had contacted GS Turton and left a message (id., pp. 63-64).  However, SA DellaPenta did not know whether GS Turton called him back or whether he had a relationship with Detective Constables Turton or Henderson (id., p. 64).  SA DellaPenta had no involvement with the Welland interview and provided no direction to the Niagara Regional Police concerning the interview (id., pp. 62-63).


## ANALYSIS

### A.    Defendant's Statements to Canadian Authorities

"Generally speaking, the United States is not responsible for the conduct of foreign law enforcement officials . . . .  Moreover the Bill of Rights . . . does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law, even if the persons arrested and from whom the evidence is seized are American citizens." United States v. Getto, 2010 WL 3467860, *2 (S.D.N.Y. 2010).

"There are two exceptions to the general rule that evidence gathered by foreign officials will not be excluded or suppressed. First, where the conduct of foreign officials in acquiring the evidence is so extreme that they shock the judicial conscience a federal court in the exercise of its supervisory powers tan require exclusion of the evidence so seized . . . .  The

second exception is where cooperation with foreign law enforcement officials may implicate

constitutional restrictions . . . . [such as] where there is evidence of a joint venture or where the

cooperation is designed to evade constitutional requirements." Id., *3.

Post-hearing, defendant invokes both exceptions, arguing that his interview by

Detective Constable Henderson "was conducted in a joint task force fashion" and that "the

circumstances surrounding the interrogation shock the conscious [*sic*]". Defendant's Post

Hearing Memorandum of Law [45], p. 4.  He also relies on the Sixth Amendment, arguing that

"[t]he [Canadian] interrogator knew that the defendant  had spoken with duty counsel. No

additional questioning should have been conducted." Id., p. 5.


### 1.      Was This a Joint Venture Between Canadian and American Authorities?

"[T]he joint venture doctrine . . . holds that statements elicited during overseas

 interrogation by foreign police in the absence of Miranda warnings must be suppressed

whenever United States law enforcement agents actively participate in questioning conducted by

foreign authorities . . . . While the Court of Appeals has not precisely defined what it means for

United States officials to 'actively participate' in foreign interrogation, the general rule is that the

mere presence or indirect involvement of United States law enforcement agents does not give

rise to a joint venture, whereas coordination and direction of an investigation or interrogation

does." United States v. Hashmi, 2009 WL 2496272, *4 (S.D.N.Y. 2009). "The fact that the

United States solicited assistance from [foreign authorities], or that the search and seizure was

prompted by United States officials is not enough to be considered 'joint' for these purposes . . . .

U.S. agents must play [a] direct and substantial role in the misconduct." Getto, 2010 WL 3467860, *3.

There is no evidence of a "joint venture" in this case. Although U.S. authorities were notified of defendant's arrest by Canadian authorities, the record does not suggest that they participated in, much less coordinated or directed, the Canadian investigation. Therefore, defendant may not rely upon this exception.

**2.  Does the Canadian Investigation "Shock the Conscience"?**

The applicability of this exception should not even be considered, since it was not raised in defendant's pre-hearing motion (Saraceno Affirmation [20], ¶¶16-30).[3] "Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress." United States v. Restrepo-Rua, 815 F.2d 1327, 1329 (9th Cir. 1987). In any event, I would reject defendant's reliance upon this exception even if it had been timely raised.

I admit that I am troubled by Detective Constable Henderson's continued questioning of defendant after he told her that he did not want to incriminate himself and wished to speak to an attorney. I have no doubt that, had such questioning occurred in this country, it clearly would have been improper. "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation . . . . [A] suspect who has invoked the right to counsel

---

[3]    As indicated in my February 6, 2012 Text Order [33], defendant's initial motion sought suppression of the statements he "provided to Canadian authorities in violation of his right to counsel because they were allegedly the product of a joint investigation between the United States and Canada".

cannot be questioned regarding any offense unless an attorney is actually present." <u>Davis v.</u>
<u>United States</u> 512 U.S. 452, 458 (1994).

However, that questioning did *not* occur in this country, and "the Sixth
Amendment does not offer any protection concerning charges pending in foreign nations".
<u>DeSilva v. DiLeonardi</u>,  181 F.3d 865, 868 (7th Cir. 1999). In my view, the circumstances of
defendant's Canadian interrogation are not sufficiently egregious to "shock the judicial
conscience".[4] "Although not exhaustively defined, the types of circumstances that warrant the
application of this exception generally involve the use of torturous interrogative methods."
<u>Hashmi</u>, 2009 WL 2496272, *5. *See also* <u>Getto</u>, 2010 WL 3467860, *3 (holding that the "shock
the conscience" exception "typically requires allegations consistent with torture or other truly
heinous conduct"); <u>United States v. Nagelberg</u>, 434 F.2d 585, 587 n. 1 (2d Cir.1970), <u>cert.</u>
<u>denied</u>, 401 U.S. 939 (1971) ("There is no showing that the statement was coerced or taken in
violation of the laws of Canada. There is no claim of 'rubbing pepper in the eyes,' or other
shocking conduct").

For the same reasons, I am unpersuaded that the other hardships cited by
defendant ("he was held in a frigid cell and not offered any water. He was only given coffee and
caffeinated drinks. By the time he was questioned he had been severely sleep deprived."
(Defendant's Post Hearing Memorandum [45], p. 4)) are sufficient to "shock the judicial
conscience". Defendant does not suggest that Canadian authorities intentionally deprived him of
sleep, and appears quite coherent in the DVD of the interview.

---

[4]       For example, the DVD [42-3] makes clear that although Detective Constable Henderson
continued to question defendant after he told her he did not wish to speak to her, she did tell him that he
did not have to say anything.

Therefore, I find no basis to recommend suppression of defendant's statements to Canadian authorities.

**B.        Defendant's Statements to United States Authorities**

Defendant argues that "[t]he statement made in the U.S. should be suppressed based on Sixth Amendment grounds. By the time the U.S. authorities had questioned the defendant, they knew that legal proceedings had commenced in Canada. They also knew that the defendant had briefly spoken with Canadian duty counsel. The Sixth Amendment right to counsel attaches upon commencement of adversary judicial proceedings . . . . By the time the defendant was handed back over to U.S. authorities, no further questioning should have taken place." Defendant's Post Hearing Memorandum of Law [45], p. 5. In response, the government argues that "defendant was provided with his Miranda warnings at the outset of the interview by SA Della Penta on June 30, 2010, when he returned to the United States from Canada". Government's Post-Suppression Hearing Memorandum [46], p. 4.[5]

It is undisputed that at the time of his questioning by U.S. authorities, no criminal proceedings had been commenced in this country. Defendant cites no authority for the proposition for the proposition that the commencement of criminal proceedings in *another* country triggers Sixth Amendment protections in *this* country, presumably because there is no

---

[5]        In his initial suppression motion, defendant argued that "[s]ome of the statements . . . were alleged to have been made prior to him receiving his Miranda warnings". Saraceno Affirmation [20], ¶17.  However,  since defendant's affidavit [30] did not allege that he provided statements to United States authorities without Miranda warnings, I concluded "that defendant has not established a triable issue of fact warranting an evidentiary hearing on this aspect of his motion".  February 6, 2012 Text Order [33].

such authority. *See* <u>DeSilva</u>, 181 F.3d at 868 ("the Sixth Amendment does not offer any protection concerning charges pending in foreign nations").

**CONCLUSION**

For these reasons, I recommend that defendant's motion to suppress statements [20] be denied.  Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by September 13, 2012 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance.  <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not

raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district

judge's refusal to consider the objection.


DATED:   August 27, 2012


/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge